BERKELEY PUMP COMPANY *v.*REED-JOSEPH LAND COMPANY et al

82-197                                    653 S.W.2d 128

Supreme Court of Arkansas
Opinion delivered June 6, 1983
[Supplemental Opinion on Denial of Rehearing delivered July 18, 1983.]

386

*Atchley, Russell, Waldrop & Hlavinka,* by: *Victor Hlavinka,* for appellant.

*Smith, Stroud, McClerkin, Dunn & Nutter,* by: *Charles A. Morgan,* for appellee Reed-Joseph Land Company.

*Hubbard, Patton, Peek, Haltom & Roberts,* by: *Phillip N. Cockrell* and *James R. Hubbard,* for appellees S & W Well Drilling and Irrigation Corporation and Riceland Machine & Supply Corporation.

STEELE HAYS, Justice. This products liability case involves three irrigation pumps consisting of components manufactured by Berkeley Pump Company, appellant, and assembled and installed by Riceland Machine and Supply Corporation and S & W Well Drilling and Irrigation Corporation, appellees. The pumps were purchased in 1978

from Riceland by J. B. Joseph and Clark Reed, appellees, to supply irrigation to Reed-Joseph's rice and soybean crops on lands along the Red River in Miller County. In addition to relying on the pumps for their own irrigation needs, Reed-Joseph contracted with Agri-Vestors Corporation, appellee, to supply water for Agri-Vestors' rice crop.

A few years earlier, Reed-Joseph had purchased a pumping system from Riceland with components supplied by Berkeley consisting of three slant-mounted pumping units having a combined capacity of 30,000 gallons per minute. Wanting an increase in capacity, and relying on performance curves published by Berkeley, Reed-Joseph elected to purchase three new Berkeley impellers which were expected to produce 36,000 gallons per minute. The system, installed in April, 1978, performed inadequately, resulting in drought damage to the crops of Reed-Joseph and Agri-Vestors, and springing this litigation.

Riceland initiated this action by suing Reed-Joseph for the value of the pumps and equipment. Reed-Joseph counterclaimed for damages for its crop losses on counts of strict liability, breach of express and implied warranties, negligence and fraud. Riceland brought Berkeley in by third-party complaint seeking contribution and indemnity and tendering to Berkeley the defense of the Reed-Joseph claims. Agri-Vestors intervened seeking recovery for its losses.

The case was submitted to the jury on all theories and a verdict of $684,753.42[1] was awarded Reed-Joseph. Riceland was awarded judgment of $134,039.15 and indemnified against Berkeley as to any money recovered by Reed-Joseph and Agri-Vestors with responsibility for the total fault apportioned by the jury at 90% to Berkeley, 10% to Riceland. Riceland was granted full indemnification from Berkeley and awarded $134,039.15 as expenses incurred in defending the litigation. Reed-Joseph was also awarded $15,698.15 and prejudgment interest of $126,081.20. Riceland was given judgment against Reed-Joseph for $32,407.22 plus pre-judgment interest of $5,833.30.

---

[1] By stipulation, $45,000.00 went to Agri-Vestors.

On appeal, Berkeley alleges numerous errors, some of which must be sustained. It is urged that there was no breach of warranty for a particular purpose as there was no evidence that any particular purpose was communicated to Berkeley; that it was error to submit the case to the jury on the issue of strict liability and on the issue of fraud; that the court should not have awarded Reed-Joseph $15,698.15 and prejudgment interest, nor should it have indemnified Riceland and allowed it to recover the costs of defense.

Riceland argues on cross-appeal that prejudgment interest should not have been awarded to Reed-Joseph and, in the event of reversal, that the jury should not have been instructed with respect to breach of an express warranty because any such warranties were negated by Reed-Joseph's failure to comply with certain conditions of warranty; that there was no evidence that Riceland knew of any particular purpose intended for the pumps and the jury should not have been instructed on the issue of a breach of warranty of fitness for a particular purpose.

I

We first consider what we regard as the pivotal point, whether under the evidence it was appropriate to submit the issue of strict liability to the jury.

After the immunity of manufacturers to all but the original purchaser was destroyed by *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916) the progress of products liability was gradual but deliberate. Producers of food and beverages experienced the first exposure and other manufacturers followed. In 1960 the Supreme Court of New Jersey applied strict liability to the user of a defective automobile, though wholly on the basis of an implied warranty. See *Henningsen* v. *Bloomfield Motor Company*, 32 N.J. 358, 161 A.2d 69 (1960).

In 1965, decisions were reached in two significant cases: in February the New Jersey Supreme Court handed down *Santor* v. *A. and M. Karagheusiam, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), upholding a recovery of an economic loss by a consumer against the manufacturer of a defective

rug, recognizing a cause of action in tort, independent of fault or warranty. Justice Francis described the cause as hybrid in character, "having its commencement in contract and its termination in tort." A few months later the Supreme Court of California, through Chief Justice Traylor, rejected the reasoning of *Santor,* saying "only if someone had been injured because the rug was unsafe for use would there have been any basis for imposing strict liability in tort." *Seely* v. *White Motor Company,* 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17 (1965). The opinion points out that the tentative draft of 402A, Restatement of Torts (Second) limits recovery in strict liability to physical harm to persons or property.

That same year 402A was formally adopted by the American Law Institute, providing that one who sells "any product in a defective condition unreasonably dangerous to the user or consumer or to his property" is strictly liable. With the approval of 402A, strict liability "swept the country," [Prosser, *The Law of Torts,* § 98 at p. 567-8 (4th Edition 1971)] and within a decade all but a few jurisdictions had embraced the concept (*Berman* v. *Watergate West, Inc.,* 391 A.2d 1351 [D.C. 1978]).

In Arkansas the change from fault to strict liability was legislative rather than judicial, with the adoption of Act 111 of 1973, which provides for strict liability by suppliers of a product "in a defective condition which rendered it unreasonably dangerous." (Ark. Stat. Ann. § 85-2-318.2). While our act is "substantially verbatim" to 402A (*See* Woods, *Products Liability: Is Comparative Fault Winning the Day?* 36 Arkansas Law Review, No. 3, p. 360, at 364), Act 111 broadened the scope of strict liability in two important respects: by substituting "supplier" for "seller" and injury to "persons and property" for "users" or "consumers." More recently, the legislature enacted the "Arkansas Products Liability Act of 1979" (Act No. 511) (Ark. Stat. Ann. §§ 34-2801 — 34-2807 [Repl. 1962]), which makes no substantive changes, but simply codifies certain precepts and evidentiary rules affecting strict liability. (Powell, *Survey of Torts,* 3 UALR Law Journal 316.)

With that background, we turn to Berkeley's arguments. It contends that strict liability is not applicable: one,

where the product, in spite of any defective condition, does not constitute an unreasonable danger to persons or property; or two, in the absence of injury to persons, such defect causes purely economic loss.

We addressed the issue of economic loss only recently in *Blagg* v. *Fred Hunt Co., Inc.,* 272 Ark. 185, 612 S.W.2d 321 (1981), where by dictum we opted in favor of the reasoning of Justice Francis in the *Santor* case. We see no need to review that choice. The other phase of the argument, i.e. that the product must be unreasonably dangerous, was not raised in *Blagg* and accordingly was not decided. Nor was it raised in another recent decision, *Southern Company* v. *Graham,* 271 Ark. 223, 607 S.W.2d 677 (1980). Thus, we have not yet considered to what extent a product in a defective condition must be "unreasonably dangerous" so as to render the supplier or manufacturer strictly liable.

We have little doubt that the language of 402A contemplates a type of defect which renders the product not merely inadequate, but one which poses an actual danger to persons or property. That is explicit in the language, "any product in a defective condition unreasonably dangerous", and is said at least as plainly in our statute, which requires that the defective condition render the product unreasonably dangerous. We construe the wording as requiring a defect that renders the product not simply deficient but dangerous.

In spite of the clear language of 402A, some disagreement has developed over the terms "unreasonably dangerous" and "defective condition". A few states have placed the emphasis on defectiveness. In *Cronin* v. *J.B.E. Olson Corp.,* 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972), the California Supreme Court refused to set aside a verdict for a consumer whose injuries were incurred when a defective safety hasp on a bread truck broke, allowing heavy trays of bread to slide forward into the driver. The result is understandable enough, as a defective hasp behind the driver's seat of a bread truck readily suggests a danger within the scope of 402A. But the trial court had not instructed the jury that it must find the condition "unreasonably dangerous" as well as defective and the Supreme Court declined to reverse. Noting that strict liabilty was adopted in Cali-

fornia, not in the aftermath of 402A, but in advance of it, in the form of *Greenman* v. *Yuba Power Company,* 59 Cal. 2d 57, 377 P.2d 897, 27 Cal. Rptr. 697 (1962), the Supreme Court reasoned that to require proof that a product is both defective and unreasonably dangerous imposes a greater burden on the plaintiff than was applied in *Greenman.* Thus, the court concluded that it was not bound by the unreasonably dangerous requirement of 402A because of that history. Cases following *Cronin* are *Azzarello* v. *Black Brothers Co., Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978); *Mandell* v. *Gulf Leasing Corp.,* 250 Pa. Super. 128, 378 A.2d 487 (1977); *Glass* v. *Ford Motor Co.,* 123 N.J. Super. 599, 304 A.2d 562 (1973); *Berkebile* v. *Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975).

In Arkansas, however, Model Jury Instructions have contained instructions drafted in response to our strict liability act since their approval in 1973. AMI 1008 and AMI 1012 tell the jury that a plaintiff must prove, among other things, that the product was supplied in a defective condition which rendered it unreasonably dangerous, and the defective condition was a proximate cause of the damage. We believe it was not the intent of 402A to make manufacturers insurers of their products, irrespective of danger, fault or warranty, and going beyond foreseeable consequences, and hence to apply strict liability simply on the basis of a finding of "defective condition" widens the scope of 402A considerably. [See *Suvada* v. *White Motor Co.,* 32 Ill. 2d 612, 210 N.E.2d 182 (1965)]. This is the majority view and is consistent with the views of Dean John W. Wade, who participated in the formulation of 402A. He explains that strict liability under the Restatement "is not to be imposed unless [the defect] makes the product unreasonably dangerous".

> The only real problem is whether the product is "unreasonably dangerous," because "defective condition", if it is to be applied at all, depends on that. Strict liability is appropriate for these cases, and it would be better in them not to refer to any requirement of defectiveness. As a matter of fact, even in the first type of cases in which the article was defective because of

something that went wrong in the manufacturing process, *the true problem in the end is whether that defect makes the product unreasonably dangerous.* (Our italics.) ("Strict Tort Liability of Manufacturers", 19 Southwestern Law Journal 5, at p. 15.)

A majority of cases have taken a position counter to the result in *Cronin: Ford Motor Company* v. *Lonon,* 398 S.W.2d 240 (Tenn. 1966); *Northern Power Co.* v. *Caterpiller,* 623 P.2d 324 (Alaska, 1981); *Vineyard* v. *Empire Machinery,* 119 Ariz. 502, 581 P.2d 1152 (Ct. App. 1978) (expressly rejecting *Cronin*); *Liberty Mutual* v. *Sears,* 35 Conn. 687, 406 A.2d 1254 (1978); *Texsun Feedyards Inc.* v. *Ralston Purina Co.,* 447 F.2d 660 (5th Cir. 1971) (feed supplement failed to increase weight of cattle, as intended. Strict liability held not to apply where product was not dangerous, simply ineffective). *Kirkland* v. *General Motors,* 521 P.2d 1353 (Okla. 1974); *Brown* v. *Western Farmers Assn.,* 268 Or. 470, 521 P.2d 537 (1974); *Heldt* v. *Nicholsen Manufacturing Company,* 72 Wis. 2d 110, 240 N.W.2d 154 (1976); *Medham* v. *White Laboratories,* 639 F.2d 394 (7th Cir. 1981); *Two Rivers* v. *Curtiss Breeding Co.,* 624 F.2d 1242 (5th Cir. 1980); *Patthoff* v. *Alms, Clark Equipment Co., et al,* 41 Colo. App. 51, 583 P.2d 309 (1978), (expressly rejecting *Cronin* as the minority view). *Tenney* v. *Seven-Up Co.,* 92 N.M. 158, 584 P.2d 205 (Ct. App. 1978); *Moorman Manufacturing Co.* v. *National Tank Co.,* 91 Ill. 2d 69, 435 N.E.2d 443 (1982). See cases cited in 13 ALR 3d 1057 and in 63 Am. Jur. 2d § 132 p. 138.

Here, we can find no evidence that the defectiveness of Berkeley's pumps rendered them dangerous — inadequate and dysfunctional, to be sure, but not dangerous. The pumps may have failed to produce the volume of water Reed-Joseph had a right to expect, but those are issues of warranty, negligence, or misrepresentation and do not render them unreasonably dangerous within the meaning of our act.

Reed-Joseph concedes the question to be whether there is sufficient evidence to sustain a finding that the irrigation pumps or parts were in a defective condition which rendered them unreasonably dangerous, but they cite nothing from the testimony or proof to enable us to confirm that this

evidence exists. Their brief suggests that the sale of pumps by Berkeley "without adequate submergence data or without a warning that such data was available, made these pumps 'defective' and their use 'unreasonably dangerous' to the lands, crops and property" of Reed-Joseph. There are two answers to the argument: first, the fact that the pumps failed to produce water at a level desired or expected does not render them dangerous, at worst, merely useless. Moreover, the comments to 402A and our Act 511 define unreasonably dangerous as requiring something *beyond* that contemplated by the ordinary and reasonable buyer, taking into account any special knowledge of the buyer concerning the characteristics, propensities, risks, dangers, and proper and improper uses of the product. The likelihood that a pump might fail to produce an optimum volume of water on a sustained basis (whatever the river levels and conditions might be) could hardly be thought to be beyond the contemplation of a knowledgeable buyer, such as we have here. The testimony of Mr. Barthell Joseph makes it clear that he was thoroughly familiar with irrigation techniques and aware that pump performances varied, depending on a number of conditions. It would be too much to think that it was beyond his comprehension that a pumping system like this one might not produce the goal of 36,000 gallons per minute, and was, therefore, unreasonably dangerous. The evident fact is that Reed-Joseph watched the results of the new system closely, and Mr. Joseph testified that by May, 1978, soon after the new pumps were installed in April, it was apparent that the new system was not producing as much water as before. Second, the fact that the pumps failed to produce the volume of water expected is not a hidden, latent danger, but an obvious one, which carries no duty to warn. *Rost* v. *C. F. & I. Steel Corp.*, ___ Mont. ___, 616 P.2d 383 (1980); *Jacobson* v. *Colorado Fuel and Iron Corp.*, 409 F.2d 1263 (9th Cir. 1969); *Garrett* v. *Nissen Corp.*, 84 N.M. 16, 498 P.2d 1359 (1972).

We conclude that the pumps were not dangerous within the context of strict liability and it was error to submit that issue to the jury.

## II

Berkeley insists the jury should not have been instructed with respect to breach of warranty of fitness for a particular purpose because there is no evidence to show that any particular purpose of Reed-Joseph was communicated to Berkeley. Instruction No. 26 explained to the jury the six theories on which the case was being submitted, i.e. strict liability, negligence, breach of an implied warranty of merchantability, implied warranty of fitness for a particular purpose, breach of an express warranty, and fraud.

Comment 2 to Ark. Stat. Ann. § 85-2-315 (Repl. 1961), Uniform Commercial Code, explains how a "particular purpose" may differ from an ordinary purpose:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

Berkeley argues that before a supplier can be held liable for a breach of warranty of fitness for a particular purpose, it must be shown the supplier knew that a particular purpose was intended by the consumer. Granted, but it is enough if the supplier is aware of the particular purpose a buyer has in mind and permits the buyer to make the purchase on the assumption that the goods are suitable for his needs. That was our holding in *Delamar Motor Co.* v. *White*, 249 Ark. 708, 460 S.W.2d 802 (1970). Nor must actual knowledge be evidenced; it is enough that under all the circumstances the supplier has reason to realize the purpose intended or that the reliance exists. *Lewis* v. *Mobil Oil Corporation*, 438 F.2d 500 (8th Cir. 1971). *Wilson* v. *Marquette Electronics, Inc.*, 630 F.2d 575 (8th Cir. 1980). We cannot say with certainty there was no evidence arising from the arrangements between Berkeley, as seller, either through Riceland, or direct with Reed-Joseph, as buyer, from which the jury could have

inferred Berkeley's awareness of the purpose intended for these pumping components.

## III

Two closely related points are that a) the trial court should not have instructed the jury on the issue of fraud, because the evidence failed to show a misrepresentation and an intent by Berkeley to deceive; and b) it was error to give an instruction framed in terms of AMI 601 and 903, that a violation of Ark. Stat. Ann. § 70-904 (Repl. 1979), prohibiting the employment of any deception or the intentional concealment of a material fact in the sale or advertisement of goods, could be considered as evidence of negligence.

Our cases dealing with fraud state generally that fraud is never presumed. *Hembey* v. *Cornelius*, 182 Ark. 417, 31 S.W.2d 539 [1930]), and requires that one party intentionally induce the other party to rely on a representation he knows to be false or, not knowing, that he asserts to be true. [*Welch* v. *Farber*, 188 Ark. 693, 67 S.W.2d 588 (1934)].

Reed-Joseph concedes that there was no affirmative misrepresentation, rather, they argue, there was an intentional and positive concealment of material facts, though what was concealed is not spelled out in specific terms. They do cite a letter from Berkeley to Reed-Joseph containing information regarding the pumps but evidently this was furnished after the components were purchased by Riceland in 1978 and how the information is misleading, even in retrospect, is not made clear.

Reed-Joseph submits that Berkeley was in a fiduciary relationship, but we cannot agree with that assertion. Two early Arkansas cases are cited: *McDonough* v. *Williams*, 77 Ark. 261, 92 S.W. 783 (1905) and *Gillespie and Wife* v. *Holland*, 40 Ark. 28, 48 AmRep 1 (1882). Those cases are plainly distinguishable. In *Gillespie*, a youthful, inexperienced woman was overreached by an older brother who stood *in loco parentis* to her; in *McDonough* the decision describes intimate business dealings from which a confi-

dential relationship could be inferred. We find nothing comparable here.

Reed-Joseph quotes a familiar passage of law that there are times when the law imposes a duty to speak rather than remain silent, when a failure to speak is the equivalent of fraudulent concealment (37 Am Jur 2, Fraud and Deceit, § 146). But this rule is based on special circumstances not evident here, such as a confidential relationship, so that a duty to speak arises where one party knows another is relying on misinformation to his detriment. The general rule is to the contrary, and ordinarily, absent affirmative fraud, a party, in order to hold another liable in fraud (as opposed to breach of implied warranty, as in *Delamar, supra*), must seek out the information he desires and may not omit inquiry and examination and then complain that the other did not volunteer information. (See 37 *Corpus Juris Secundum*, Fraud, § 15, p. 242 and Smith, "Law of Fraud", § 8 p. 18.) We find nothing in the abstract suggesting circumstances from which that rule of law might be found applicable. If fraud exists, whether affirmatively or by concealment, it ought not to be difficult to isolate and cite it. We conclude that the evidence of fraud was not sufficient to warrant submitting that issue to the jury.

Assuming at a second trial that fraud is established so as to constitute a submissible issue, we find no error in the instruction to the jury framed in terms of AMI 601 and 903. We have often said that violation of a statute is evidence a jury may consider in determining whether a defendant is guilty of negligence. *Bridgforth* v. *Vandiver*, 225 Ark. 702, 284 S.W.2d 623 (1955); *Bussell* v. *Missouri Pacific Railroad Co.*, 237 Ark. 812, 376 S.W.2d 545 (1964). Moreover, our rule gives the defendant the benefit of the more favorable view, notwithstanding a majority view to the contrary [See Prosser, *Law of Torts*, at 200 (4th edition)], i.e. that such violation is merely evidence of negligence and not negligence per se. Here, the statutes were designed to protect the public from deceptive marketing and advertising practices and there is sound authority that such statutes imply a right of enforcement by civil action by persons injured by their breach. (*Id.* at § 36, p. 191.) We have upheld the giving of a

comparable instruction to AMI 601 in civil litigation based on the violation of a criminal act. *Rogers* v. *Stillman*, 223 Ark. 779, 268 S.W.2d 614 (1954). Similar instructions have been upheld in consumer acts. See *Sellinger* v. *Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 521 P.2d 1119 (1974); *Rice* v. *Snarlin, Inc.*, 131 Ill. App. 3d 434, 266 N.E.2d 183 (1970); *Young* v. *Joyce*, 351 A. 2d 857 (Del. 1975).

## IV

Berkeley's argument that the trial court erred in augmenting the judgment awarded Reed-Joseph by the added sum of $15,698.18 in accordance with a stipulation between the parties is rendered moot by the remand of this case and may or may not be relevant to a second trial.

## V

Berkeley's argument that it was error to allow Reed-Joseph prejudgment interest of $126,081.29 is also rendered moot by this decision, but because the issue may confront the trial court on retrial, we need to consider it. While we have approved prejudgment interest on claims involving specific amounts or for the recovery of damages to property where values were susceptible of exact determination, it has been the rule in this state, and in most jurisdictions, that prejudgment interest is generally not recoverable where damages are inexact and uncertain. *Lovell* v. *Marianna Federal Savings and Loan Association*, 267 Ark. 164, 589 S.W.2d 577 (1979). There are exceptions, and no hard and fast rule has emerged.

Both sides cite *Lovell*, where we reversed and remanded an equity case for the allowance of prejudgment interest. The dispute was over a refusal by a savings and loan association to pay a certificate of deposit totalling $36,000.00. Noting that the CD's had an exact value on the date payment was wrongfully refused, we ruled prejudgment interest should have been allowed. The *Lovell* opinion reviewed earlier decisions of this court in an attempt to reconcile conflicting cases and draws several

conclusions: a) that the test of the recoverability of prejudgment interest is whether there is a method of determination of the value of the property at the time of the injury; b) where the damages cannot be ascertained at the time of the loss, prejudgment interest should not be allowed; c) where damages cannot be measured until some future date, as with personal injuries, prejudgment interest is not recoverable; d) if the damages are not by their nature capable of *exact* determination, both in time and amount, prejudgment interest is not an item of recovery.

Reed-Joseph asserts that because it carefully compiled production records of other crop yields in its farm system, which were not deprived of water, it was possible to show exact damages. The argument has some merit, in that it removes some of the uncertainty of crop damage claims, but that is only half the test, at best, as it is clear that for interest to attach, the loss must have occurred at a specific time. That was the case in *Dickerson Construction Co. v. Dozier*, 266 Ark. 345, 584 S.W.2d 36 (1979), where we allowed prejudgment interest for damage to "knee-high" soybeans totally destroyed by heavy rains within a forty-eight hour period, resulting from the defendants having wrongfully dammed a drainage ditch. Here, no matter how carefully comparable records were compiled, drought damage to crops because an irrigation system produced less water per minute than expected, results in losses that cannot be specifically determined as to time, certainly not during the growing season, as the damage is a gradual process brought on by the deprivation of a necessary element.

We note, too, that the damages alleged in Reed-Joseph's pleadings were not exact amounts, but stated in broad terms typical of general damage claims: in the counterclaim against Riceland damages of $1,000,000.00 were claimed and by amendment against Berkeley, $750,000 (filed September 29, 1980) for crop losses and additional sums for interest and coincidental expense.

Cases decided since *Lovell* have stressed the requirement of certainty as to time and amount. See *Brown* v. *Summerlin Assoc., Inc.*, 272 Ark. 298, 614 S.W.2d 227 (1981);

*Wooten* v. *McClendon,* 272 Ark. 61, 612 S.W.2d 105 (1981) and *Taylor* v. *Jones,* 495 F.Supp. 1285 (E.D. Ark. 1980). In *Wooten,* we said:

> Prejudgment interest is compensation for recoverable damages wrongfully withheld from the time of the loss until judgment. This interest must be allowed for any injury where, at the time of loss, damages are immediately ascertainable with reasonable certainty.

## VI

Berkeley contends evidence of its financial condition should not have been introduced and we sustain the contention. Proof of financial condition where punitive damages are claimed is allowed as against a single defendant [*Holmes* v. *Hollingsworth,* 234 Ark. 347, 352 S.W.2d 96 (1961)]; however, we have held that because of the obvious prejudice that results when one of several defendants is singled out by the introduction of his financial condition, the right to make such proof is waived where there are two or more defendants. See *Life and Casualty Insurance Co.* v. *Padgett,* 241 Ark. 353, 407 S.W.2d 728 (1966). We adhered to that principle in two recent decisions: *Dalrymple* v. *Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982) and *Curtis* v. *Partain, Judge,* 272 Ark. 400, 614 S.W.2d 671 (1981). On retrial, evidence of Berkeley's financial condition should not be received in evidence.

## VII

Berkeley contends the court erred in refusing to give an instruction on intervening cause. However, the instruction is not abstracted and we have consistently held it is appellant's duty to furnish us with an abridgement of the record, including the instructions, where appropriate, as will enable us to follow the arguments. *Hurley* v. *Owens,* 238 Ark. 874, 385 S.W.2d 636 (1965); *Jacobs and Garrett* v. *Bentley,* 86 Ark. 186, 110 S.W. 594 (1908); *St. Louis, Iron Mountain and Southern Railroad Co.* v. *Boyles,* 78 Ark. 374, 95 S.W. 783 (1906).

## VIII

Another assertion by Berkeley is that it was error to award judgment in favor of Riceland for costs of defending the litigation and for any amounts recovered from Riceland by either Reed-Joseph or Agri-Vestors on the basis of indemnity. While these issues are mooted by our reversal, it should be said for the purposes of another trial the jury's finding the plaintiff's damage was the result of *active* fault by Riceland, which the jury apportioned at 10% by Riceland against 90% by Berkeley, renders the problem one of contribution, and not of indemnity. See Prosser, Law of Torts, 4th Edition, § 51 p. 310. If retrial should result in similar findings, Riceland would be entitled to *contribution* from Berkeley for any amounts recovered from it by Reed-Joseph in excess of Riceland's portion of the fault, but Riceland would not be entitled to *indemnity* from Berkeley for any amounts paid in satisfaction of the judgment, nor for expenses incurred in connection with the litigation. We believe interrogatory No. 2, encompassed within the instruction labeled Court's 3A, is overly broad and should not have been given.

Riceland argues on cross-appeal that it was error for the trial court to give instruction No. 26 on the theory of a breach of express warranties as it related to Riceland, because any express warranties were negated by Reed-Joseph's failure to meet Riceland's conditions of warranty. Riceland cites three Texas cases [*Fetzer v. Haralson,* 147 S.W. 290 (Tex. Civ. App. 1912), *Londen v. Curlee,* 336 S.W.2d 836 (Tex. Civ. App. 1960) and *Elanco Products Co. v. Akin-Tunnell,* 474 S.W.2d 789 (Tex. Civ. App. 1971), on appeal after remand, 516 S.W.2d 726], for the rule that a purchaser of goods covered by an express warranty, must show that he complied with any conditions to which the warranty was subject. But we think the court's instruction No. 27 recognized that any express warranties made to Reed-Joseph may have been subject to certain conditions and told the jury, first, that it was Riceland's burden to prove those conditions and if the jury so found, then it was Reed-Joseph's burden to prove such conditions were satisfied. It would require an independent search of the testimony to

determine the existence of evidence of compliance with conditions of warranty, and we are unwilling to do that where Riceland has omitted in the first instance to point to the evidence that such conditions were, in fact, imposed.

Riceland's other argument, i.e. prejudgment interest and breach of warranty for a particular purpose, coincide with Berkeley's points of error and have been dealt with earlier in this opinion.

Reversed and remanded.

### Supplemental Opinion on Denial of Rehearing delivered July 18, 1983

1. DAMAGES — PUNITIVE DAMAGES — PROOF OF FINANCIAL RESPONSIBILITY. — Although a plaintiff who claims punitive damages from several defendants waives the right to introduce evidence of the financial worth of *one* defendant, where punitive damages are claimed from only one of several defendants, that right to introduce evidence of financial condition is not waived when the alleged improper conduct is different from, and greater than, that of the other defendant.

2. DAMAGES — PROOF OF FINANCIAL RESPONSIBILITY — ADMONITION TO JURY. — If the evidence on retrial is sufficient to submit the issue of punitive damages to the jury, the plaintiff may introduce evidence of Berkeley's financial condition, with the jury admonished to consider such evidence only in connection with the claim of punitive damages.

3. DAMAGES — HARMLESS ERROR TO SUBMIT PUNITIVE DAMAGE ISSUE TO JURY ON INSUFFICIENT EVIDENCE. — It is usually harmless error to submit the issue of punitive damages to the jury where there is insufficient evidence to support such an instruction.

4. DAMAGES — REVERSIBLE ERROR TO SUBMIT ISSUE OF PUNITIVE DAMAGES TO JURY ON INSUFFICIENT EVIDENCE WHERE PROOF OF FINANCIAL CONDITION ALSO INTRODUCED. — If evidence of financial condition is also introduced, then the error of submitting the issue of punitive damages to the jury absent sufficient proof becomes reversible because a verdict for compensatory damages is tainted by the improper evidence.

STEELE HAYS, Justice. In its motion for rehearing, Reed-Joseph contends first, that there was sufficient evidence of misrepresentation and intentional deceit by Berkeley to sustain the submission of the issue of punitive damages to

the jury and second, that our opinion erroneously assumed that punitive damages are being claimed against Berkeley and Riceland, when in fact punitive damages are claimed only against Berkeley. Reed-Joseph insists that the trial court carefully adhered to the requirements of *Dalrymple* v. *Fields,* 276 Ark. 185, 633 S.W.2d 362 (1982), and *Curtis* v. *Partain, Judge,* 272 Ark. 400, 614 S.W.2d 671 (1981), and on retrial evidence of Berkeley's net worth should be permitted. We concede the merit of the argument with respect to the introduction of Berkeley's financial condition and modify our opinion accordingly.

While we have held that a plaintiff who claims punitive damages from several defendants waives the right to introduce evidence of the financial worth of *one* defendant (see *Life and Casualty Insurance Co.* v. *Padgett,* 241 Ark. 353, 407 S.W.2d 728 [1966] and *Dalrymple* v. *Fields, supra*), we have *not* held that where punitive damages are claimed from only one of several defendants, the right to introduce evidence of financial condition is waived, where the alleged improper conduct is different from, and greater than, that of the other defendants. None of the cases cited in the original opinion reached that holding. In *Curtis* v. *Partain, Judge, supra,* we granted prohibition against the introduction of financial condition as against only one of several defendants, but it was done because that one defendant was plainly being singled out for a claim of punitive damages for conduct for which *all* were chargeable. We conclude that if the evidence on retrial is sufficient to submit the issue of punitive damages to the jury, the plaintiff may introduce evidence of Berkeley's financial condition, with the jury admonished to consider such evidence only in connection with the claim of punitive damages.

As to the other argument, i.e. misrepresentation and deceit, the issue is moot as to the first trial, and we need not belabor the point except to say that our comments in the original opinion were intended to alert the parties and the trial court, for purposes of a second trial, to the fact that the proof of intentional misrepresentation, or fraud, seemed to be too weak to support the issue. Reed-Joseph argued that the fraud was to be found in Berkeley's deliberate failure to disclose data with respect to the performance of its pumps

which was material to Reed-Joseph's intended use. We could not say categorically, without an independent search of the record, that the proof was lacking; however, we can say it was not demonstrated in the briefs to our satisfaction. Whether the issue will be sufficiently proved on retrial we have no way of predicting.

It should be noted that several cases have contained error because the issue of punitive damages was submitted to the jury when the evidence did not support it [*see Life and Casualty Insurance Co.* v. *Padgett, supra,* and *Dalrymple* v. *Fields, supra,* for example.] Ordinarily, it is merely harmless error for the issue of punitive damages to be wrongly submitted; however, if evidence of financial condition is also introduced, then the error becomes reversible because a verdict for compensatory damages is tainted by the improper evidence. This is what happened in *Padgett* and *Dalrymple.* Thus plaintiffs' counsel generally would be well advised to use restraint in urging the submission of punitive damages where the evidence is marginal and, especially, in offering proof of financial condition, as reversible error is the likely result if the punitive issue fails on review.

Other points in the petition constitute reargument and need no discussion.

Rehearing denied.