2008 OK CIV APP 90

Joey L. SPENCE, Mitch Johnson by and through Guardian, Bobbie Johnson, Bobbie Johnson, individually and, Crockett Johnson, individually, Plaintiffs/Appellants,

v.

BROWN–MINNEAPOLIS TANK, CO., Defendant/Appellee,

SEFCO, Inc.; B&T Company; Great American Tank Company; SEFCO Equipment, L.L.C.; SEFCO–Edison BMT, L.L.C.; Edison Brown–Minneapolis Tank Oklahoma, L.L.C.; GATX Corporation, and Les Sutton, Defendants.

No. 105,080.

Court of Civil Appeals of Oklahoma, Division No. 1.

June 27, 2008.

Certiorari Denied Oct. 6, 2008.

David W. Edmonds, Greg D. Givens, and Nevin R. Kirkland, Oklahoma City, OK, for Appellants.

Gerald E. Durbin, J. Logan Johnson, Katherine T. Loy, and R. Ryan Deligans, Oklahoma City, OK, and W.G. Steidley and Michelle Harris, Tulsa, OK, for Appellee.

Opinion by LARRY JOPLIN, Judge.

¶ 1 Plaintiffs/Appellants, Joey L. Spence (Spence) and Mitch Johnson (Johnson), as well as Johnson's parents in their individual and representative capacities, seek review of the trial court's order granting the motion for summary judgment of Appellee Brown–Minneapolis Tank Company (BMTCo)[1] on Plaintiffs' negligence and products' liability claims. Having reviewed the record, however, the trial court's order is affirmed.

¶ 2 Minneapolis Tank–MW (BMT–MW)[2] is a New Mexico L.L.C. based in Tulsa, Oklahoma. BMT–MW erected industrial tanks in Oklahoma and neighboring states, such as

---

1. On May 1, 2006, Plaintiffs dismissed their cause without prejudice as to Defendant, Les Sutton. On September 28, 2007, Plaintiffs dismissed without prejudice all other listed Defendants, except Appellee, BMT Co.

2. BMT–MW is/was not a party to this action.

Texas and Arkansas, using plates of steel or similar metal weighing approximately 3,500 pounds to form the sides of a tank.

¶ 3 To brace, support, and move the plates into position for assembly, BMT–MW used "plate buggies." BMT–MW ordinarily built its own "plate buggies." [3] However, in 2002, BMT–MW acquired some used "plate buggies" and other assets of ITEQ, a Utah tank erection company.[4]

¶ 4 Spence and Johnson worked for BMT–MW erecting tanks. On October 15, 2003, they were building an industrial water tank in Arkansas, using the "plate buggies" acquired from ITEQ. When a co-worker got his hand caught between the tank structure below and the sheet that was then being attached to the structure, Johnson rushed to help. As Johnson tried to free the co-worker's hand, one of the 3,500-pound plates fell inward, knocking both Johnson and Spence off the scaffolding upon which they stood.[5] Johnson and Spence fell to the ground 35 feet below, suffering injury, and on September 27, 2005, Plaintiffs commenced the instant action, seeking actual and punitive damages on strict products' liability and negligence theories.

¶ 5 BMTCo filed a motion for summary judgment, attaching evidentiary materials demonstrating the facts we have recounted. BMTCo argued Oklahoma law governed Plaintiffs' claims,[6] and that BMTCo owed no duty to Plaintiffs, unless deemed the alter-ego of BMT–MW, in which case, the workers' compensation exclusive remedy doctrine immunized it from liability.[7] BMTCo also argued that, as a seller of a used product in the same condition as received, it bore no liability under either products' liability or negligence theories.[8] Finally, BMTCo argued it was not a commercial seller of products in any sense, and therefore not subject to strict products liability.

¶ 6 Plaintiffs responded. Plaintiffs first argued Arkansas law should apply, because the accident occurred there.[9] Plaintiffs also claimed that, because BMTCo sold surplus inventory on more than one occasion, BMTCo was a seller or supplier for purposes of maintaining its products liability claim. Plaintiffs asserted that, under both products' liability and negligence theories, BMTCo had

---

3. The plate buggies are intended to position and stabilize the newest section of metal so that it can be moved on the existing tank structure and secured to the completed portion of the tank once it is in place. As the new plate is secured to the existing tank structure, the buggies are supposed to be removed one by one. A crane can be used for this same purpose, but plate buggies may be utilized under certain circumstances.

4. In 1999, the corporate predecessor of BMT Co. purchased the assets of an existing tank erection company in Utah, ITEQ Storage Systems (ITEQ). ITEQ's assets included some plate buggies. In early 2002, BMT Co. sold the ITEQ assets to Brown–Minneapolis Tank–Rocky Mountain (BMT–RM), a Utah based New Mexico L.L.C. (not a party to this action), created for the purpose of continuing ITEQ operations in Utah. Later in 2002, BMT Co. President offered to sell the surplus ITEQ/BMT–RM equipment to BMT–MW. BMT–MW's field superintendent went to Utah to review the available inventory, made a list of the equipment BMT–MW wished to purchase (including ITEQ's plate buggies), paid BMT–RM for the equipment and brought the equipment to Oklahoma.

5. Although it is not entirely clear what caused the accident, it is apparent the plate buggies failed to keep the metal sheet stable. It is possible the buggies were not placed and moved at the correct intervals. Perhaps the third plate "kicked out" when Johnson was trying to save the co-worker's hand. This "kick out" phenomenon is a kind of shifting destabilization that can occur when the last buggy is placed too close to the end of the large unsecured metal, before it is completely secured to the structure below. In any event, neither Plaintiff was experienced in the use of plate buggies and the record indicates there were no instructions or safety information provided when the buggies were purchased used by Plaintiffs' employer.

6. Though BMTCo argued Oklahoma law in its choice of law analysis, BMTCo asserted their position was a prevailing one even with the application of any other state's law.

7. BMTCo did not concede it was the alter-ego of BMT–MW and Plaintiffs claim they have never asserted an alter-ego theory. The record does not provide enough specific corporate facts to decide the case based on this issue.

8. See, *Allenberg v. Bentley Hedges Travel Serv. Inc.*, 2001 OK 22, 22 P.3d 223.

9. Plaintiffs, like BMTCo, claimed application Oklahoma, Arkansas, New Mexico or Utah law adequately supported their position.

a duty to warn of the dangers inherent in the plate buggies, but wholly breached its duty when it failed to warn.

¶ 7 On August 1, 2007, the trial court held a hearing on the motion for summary judgment. By order filed August 29, 2007, the trial court granted judgment to BMTCo. Plaintiff appeals, and the matter stands submitted for accelerated review on the trial court record.[10]

¶ 8 This court must review a grant of summary judgment by a de novo standard. *Prudential Ins. Co. of America v. Glass,* 1998 OK 52, ¶ 3, 959 P.2d 586, 588. Review on summary judgment examines the pleadings and evidentiary material submitted to the trial court and views all inferences and conclusions that can be drawn in the light most favorable to the party opposing the motion. *Johnson v. Mid–South Sports, Inc.,* 1991 OK 17, 806 P.2d 1107. Summary judgment is proper only when there is no genuine issue of material fact. *Prudential Ins. Co. of America,* 1998 OK 52, ¶ 3, 959 P.2d at 588. If there is no substantial controversy as to any material fact and one of the parties is entitled to judgment as a matter of law, the order of the trial court granting summary judgment should be affirmed. Rule 13(e), Rules for the District Courts of Oklahoma, 12 O.S., Ch. 2, App.

¶ 9 On summary judgment, BMTCo asserted, inter alia, that it was not a seller or supplier "engaged in the business" of selling or supplying plate buggies and could not be held under strict tort liability for Plaintiffs' injuries. Plaintiffs countered that the evidence arguably showed BMTCo was engaged in the practice of selling surplus tank erection equipment, having three times previously purchased and sold assets of tank erectors, including the ITEQ assets.[11]

¶ 10 By judicial decision, Oklahoma recognizes a claim of strict products' liability. *Kirkland v. General Motors Corp.,* 1974 OK 52, 521 P.2d 1353. In Arkansas, strict products' liability is imposed by statute. *See, Berkeley Pump Co. v. Reed–Joseph Land Co.,* 279 Ark. 384, 653 S.W.2d 128 (1983). Importantly, both Oklahoma and Arkansas impose strict products' liability according to the rule announced by the Restatement of Torts (Second) § 402A (1965). *Kirkland,* 1974 OK 52, ¶¶ 12, et seq., 521 P.2d at 1358 et seq.; *Berkeley Pump Co.,* 653 S.W.2d at 131.

¶ 11 Plaintiff nevertheless argued that, because the accident occurred in Arkansas, the strict liability law of that state should control, and that Arkansas law imposed strict liability on a "supplier engaged in the business of . . . selling . . . or otherwise distributing" a "defective, unreasonably dangerous product," including a "used" product sold "as-is." See, A.C.A. §§ 4–86–102, 16–116–102; *Nationwide Rentals Co. v. Carter,* 298 Ark. 97, 765 S.W.2d 931 (1989); *Petrus Chrysler–Plymouth v. Davis,* 283 Ark. 172, 671 S.W.2d 749 (1984). Defendant responded, arguing that both Oklahoma and Arkansas strict liability law is derived almost verbatim from § 402A with only minor linguistic differences, and that the result of the application of either Oklahoma or Arkansas law would be the same. *See, e.g., Allenberg v. Bentley Hedges Travel Serv., Inc.,* 2001 OK 22, 22 P.3d 223.

¶ 12 We are unpersuaded by Plaintiff's argument. First, neither *Petrus* nor *Nationwide* discuss the element of "engaged in the business." [12] Second, and while there are indeed minor linguistic differences between the judicially-imposed rule of strict liability

---

10. See, Rule 13(h), Rules for District Courts, 12 O.S.2001, Ch. 2, App.; Ok.S.Ct.R. 1.36, 12 O.S. 2001, Ch. 15, App.

11. BMT Co.'s predecessor purchased ITEQ in 1999. BMTCo. purchased two other companies in 2001, Reliable Steel and Sefco. The Sefco and Reliable Steel purchases resulted in an asset sale similar to that of ITEQ. BMT–MW purchased the assets of Sefco and BMT–Northwest L.L.C., not a party to this action, purchased the assets of Reliable Steel.

12. In *Petrus,* the Arkansas Supreme Court found competent evidence tacitly supporting "a reasonable inference that the defendant as argued here, [was] responsible for the defect," and affirmed judgment on jury verdict for plaintiff-buyer. 671 S.W.2d at 751. In *Nationwide,* the Arkansas Supreme Court found competent evidence from which the jury could reasonably conclude that the product was defective when it left defendant's control and the defect caused plaintiff's injuries. 765 S.W.2d at 936.

in Oklahoma and the statutory strict liability of Arkansas, the fact remains that the law of both Oklahoma and Arkansas follows the rule of § 402A. Ultimately, the law of both Oklahoma and Arkansas imposes strict liability only on sellers or suppliers who are engaged in the business of selling or supplying. We therefore need not engage in any choice of law analysis.

¶ 13 In this respect, § 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The policy underlying imposition of strict products liability is well established:

[T]he justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and

the proper persons to afford it are those who market the products.

Restatement of Torts 2d, § 402A, comment c. Moreover:

The rule does not, however, apply to the occasional seller of food or other such products *who is not engaged in that activity as a part of his business.* ... The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. *This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer,* in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2–314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.

Restatement of Torts 2d, § 402A, comment f. (Emphasis added.)

 ¶ 14 Thus, in order to impose § 402A liability, the defendant must be a "seller ... engaged in the business of selling" the allegedly dangerous product. Restatement of Torts 2d, § 402A(1)(a). "Whether the defendant ... is a commercial seller or distributor within the meaning of this Section is usually a question of law to be determined by the court." Restatement (Third) of Torts: Products Liability, § 1, comment c, § 8, comment c (West 1998).

 ¶ 15 So, where, on a motion to dismiss or motion for summary judgment, the evidentiary materials show defendant is not a commercial "seller engaged in the business of selling" the allegedly dangerous product, summary judgment is properly granted to defendant. *See, e.g., Burkert v. Petrol Plus*

*of Naugatuck, Inc.,* 216 Conn. 65, 579 A.2d 26, 31 (1990); *Timm v. Indian Springs Recreation Ass'n,* 187 Ill.App.3d 508, 135 Ill. Dec. 155, 543 N.E.2d 538, 542 (1989); *Elley v. Stephens,* 104 Nev. 413, 760 P.2d 768, 771–772 (1988); *Sukljian v. Charles Ross & Son Co.,* 69 N.Y.2d 89, 511 N.Y.S.2d 821, 503 N.E.2d 1358 (1986); *Santiago v. E.W. Bliss Div.,* 201 N.J.Super. 205, 492 A.2d 1089, 1100 (1985); *Bailey v. ITT Grinnell Corp.,* 536 F.Supp. 84, 89 (N.D.Ohio 1982); *Bevard v. Ajax Mfg. Co.,* 473 F.Supp. 35, 39 (E.D.Mich. 1979); *Bruce v. Martin–Marietta Corp.,* 544 F.2d 442, 448–449 (10th Cir.(Okl.) 1976); *Siemen v. Alden,* 34 Ill.App.3d 961, 341 N.E.2d 713, 715 (1975); *McKenna v. Art Pearl Works, Inc.,* 225 Pa.Super. 362, 310 A.2d 677, 680, fn. 2 (Pa.Super.1973); *Balido v. Improved Machinery, Inc.,* 29 Cal.App.3d 633, 639, 105 Cal.Rptr. 890, 895 (1972). And see, "When is person 'engaged in the business' for purposes of doctrine of strict tort liability," 99 A.L.R.3d 671 (West 1980). On the other hand, where "[t]here is simply not enough evidence in the record to say, one way or the other, whether [defendant] is engaged in the business of selling," the order granting summary judgment should be reversed. *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1223 (5th Cir.(Tex.) 1985).

¶ 16 The parties cite, and we find, no Oklahoma Supreme Court pronouncement directly on-point. However, the Oklahoma appellate courts have clearly embraced a similar analysis, consistent with the policy announced in § 402A, comment c, which examines the extent to which the charged defendant bore responsibility for injecting the dangerous product into the stream of commerce. *Gonser v. Decker,* 1991 OK CIV APP 64, ¶¶ 6–8, 814 P.2d 1056, 1058; *Scott v. Thunderbird Industries, Inc.,* 1982 OK CIV APP 31, ¶¶ 12–14, 651 P.2d 1346, 1348–1349.

■ ¶ 17 In this respect, we find the Fifth Circuit Court of Appeals' decision in *Galindo* instructive. In *Galindo,* the trial court granted summary judgment to a sawmill operator who sometimes sold depreciated or obsolete sawmill equipment. To determine whether the defendant was "engaged in the business of selling" under § 402A(1)(a), the court enumerated several factors to consider:

> The relevant inquiry, however, is whether the seller's conduct would justify a conclusion that (1) he has undertaken a special responsibility for product safety; (2) the public has a right to expect that he will stand behind the product; and (3) as between the consumer and the seller, it is equitable to impose upon the seller the loss caused by the product and the burden of spreading that loss as a cost of doing business.
>
> . . . .
>
> [To so determine, the court may examine:] (1) the number of used equipment sales made . . . ; (2) the amount of revenue generated by those sales; (3) the number of employees or the extent of other corporate resources devoted to making the sales; or (4) the use of advertising or other marketing techniques to publicize the availability of used equipment for sale.

*Galindo,* 754 F.2d at 1221, 1222. The *Galindo* factors, emphasizing protection of the public safety, clearly mirror the policy concerns underlying both Oklahoma and Arkansas strict product's liability law. *Kirkland,* 521 P.2d at 1362;[13] *Berkeley Pump,* 653 S.W.2d at 135.

■ ¶ 18 It is apparent from the record that BMTCo acquired the assets of existing companies, ITEQ, Reliable Steel and Sefco, and dispersed the assets among the BMT family of companies, namely BMTCo, BMT–MW, BMT–RM and BMT–NW. BMTCo acquired the assets of ITEQ, Sefco and Reliable Steel to garner market share of the tank erection business in the areas where the purchases took place and build a BMT brand of sorts through the area, and the BMT family of L.L.C.s sprang from these asset purchases.[14]

¶ 19 However, none of BMTCo's transfers were made to the public. The transfer of ITEQ assets to BMT–RM, a limited liability

---

13. "The rationale for such a rule is founded upon public interest in human safety or as stated in the concurring opinion in *Escola v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436 (1944)."

14. I.e., BMT–RM from ITEQ, BMT–MW from Sefco and BMT–NW from Reliable Steel.

company created by the principal officers and stockholders of BMTCo, was a very cloistered transaction, and amounted to little more than a transfer of assets between divisions of the same company. The transfer of assets from ITEQ to BMT–RM was intended to forward BMTCo's tank-building business, its sole and only business, and the record does not show the transfer to have generated any sales revenue. The number of employees devoted to the transfer was minimal. There is no evidence of any public offering or marketing of the surplus ITEQ equipment sales.

¶ 20 Under the present facts, BMTCo's acquisition and eventual transfer of surplus assets did not demonstrate an undertaking of special responsibility for product safety as to warrant the imposition of strict products' liability. There was no public engagement which would give rise to some expectation of the public that BMTCo stood behind the equipment that was transferred to and became the makings of BMT–RM. In short, on the uncontroverted evidence adduced on summary judgment, we conclude BMTCo was not a seller engaged in the business of selling plate buggies as to justify the imposition of strict liability.

¶ 21 On the same facts as their strict liability claim, Plaintiffs also asserted a claim for negligence. However, a claim for negligence will not stand absent the existence of a duty and breach of that duty, and the existence of a duty presents a question of law. *Lowery v. Echostar Satellite Corp.*, 2007 OK 38, 160 P.3d 959. The question is, whether the actor and injured person occupy a relationship which gives rise to a legal obligation on the actor's part for the benefit of the injured person:

> [T]he policy considerations that would lead the law to recognize a legal duty of care ... include (1) foreseeability of harm to the plaintiff, (2) degree of certainty of harm to the plaintiff, (3) moral blame attached to defendant's conduct, (4) need to prevent future harm, (5) extent of the burden to the defendant and consequences to the community of imposing the duty on defendant, and (6) availability of insurance for the risk involved.

*Lowery,* 160 P.3d at 964, n. 4.

¶ 22 Under the facts of this case, the relationship between BMTCo and BMT–MW does not give rise to a legal duty of care. First, BMTCo had nothing to do with the manufacture of the plate buggies at issue. While BMTCo may have conducted an inventory of the ITEQ assets in 1999, and may have been aware of the existence of the plate buggies in inventory, that is the full extent of BMTCo's contact with the plate buggies. This was very specialized equipment that was transferred within and among a very specialized and educated group. All members of the group, BMTCo, BMT–RM, and BMT–MW, had knowledge and experience in the use of tank erection equipment. There is nothing in the record demonstrating BMTCo knew anything more about the plate buggies than the buyers or would be in any better position to understand or foresee any potential for harm arising from the buggies' use, and clearly, "[t]here is generally no duty to give warning to members of a profession against dangers generally known to members of that profession." *Scott,* 1982 OK CIV APP 31, 651 P.2d at 1349. Given the BMTCo's lack of superior knowledge, and the relationship of equals among the BMT family, no duty arises. Absent a duty, Plaintiffs' negligence claim fails.

¶ 23 The trial court's order granting Defendant's motion for summary judgment is AFFIRMED.

ADAMS, P.J., and HANSEN, J., concur.