FILED
United States Court of Appeals
Tenth Circuit

April 9, 2024

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHRISTOPHER THOMAS CAMPAS,

    Defendant - Appellant.

No. 24-4024
(D.C. No. 2:23-CR-00403-DS-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HOLMES**, Chief Judge, **PHILLIPS**, and **EID**, Circuit Judges.

_____

In November 2023, a grand jury in the District of Utah indicted Christopher

Thomas Campas on two charges: attempted coercion and enticement of a minor in

violation of 18 U.S.C. § 2422(b), and interstate travel with the intent to engage in

illicit sexual conduct in violation of 18 U.S.C. § 2423(b). Campas appeals the

district court's pretrial detention order. Exercising jurisdiction under 18 U.S.C.

§ 3145(c) and 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.     BAIL REFORM ACT STANDARDS

The Bail Reform Act requires pretrial detention "[i]f, after a hearing . . . , [a] judicial officer finds that no condition or combination of conditions will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community."  18 U.S.C. § 3142(e)(1) (bracketed numerals inserted for clarity).  When contemplating detention, the district court must consider "available information concerning":

> (1) the nature and circumstances of the offense charged, including whether the offense . . . involves a minor victim . . . ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person . . . ; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

§ 3142(g).

Section 3142 further creates a presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" certain enumerated offenses, including the offenses with which Campas has been charged.  *See* § 3142(e)(3)(E).  The defendant may rebut that presumption by producing "some evidence" that his appearance could be assured and that he would not be a danger to the community.  *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991).  If the defendant meets that burden,

2

"the [statutory] presumption [of detention] remains a factor for consideration by the district court in determining whether to release or detain." *Id.*

Regardless of the presumption's effect, "the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government." *Id.* at 1354–55. Specifically, "[t]he government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or to the community by clear and convincing evidence." *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003) (citations omitted).

## II.    BACKGROUND & PROCEDURAL HISTORY

### A.    Preparation for the Detention Hearing

When the grand jury indicted Campas in November 2023, he had already been arrested based on the alleged conduct underlying the indictment. Pursuant to the Bail Reform Act, a magistrate judge soon set a hearing to determine if Campas should remain detained pending trial.

Ahead of the hearing, the government moved for detention, and submitted the following background:

> An FBI agent was acting in an undercover capacity on a social media platform, purporting to be a father who was offering his 7-year-old son for sex. Beginning on October 11, 2023, Campas made contact with the UC on a social media platform. Over the course of the next two weeks, the two engaged in sexually explicit conversations. The FBI UC asked Campas if he had "age limits," to which Campas responded, "F**k no, nothing hotter than a father nursing his newborn on his c**k." Campas further stated that he was going to drive from Oregon to Utah to sexually

3

> abuse the 7-yr-old.  Campas described what he wanted to do to the boy in graphic detail, to include rape and sodomy.
>
> Campas arranged to meet the UC on October 27, 2023, at a prearranged location in North Salt Lake, Utah.  Campas was arrested without incident at this location.  Campas is a resident of Arizona and does not live in or have connections to Utah.  It appears he was driving from Oregon, where he had been living on a marijuana farm for the previous month, to Utah for the purpose of sexually abusing this boy.  A cell phone found with Campas was confirmed to be the cell phone communicating with the FBI UC.
>
> Campas made admissions during a post-arrest interview.  During that interview, Campas stated that he believes children are capable of consenting to sex and he does not believe what he is doing is wrong.
>
> Of significance, Campas was also communicating with other UC law enforcement officers on various social media platforms at the same time regarding his sexual interest in children.

Aplt. App. vol. I at 14 (capitalization normalized) (redactions in original).  Moreover, the government said it had "a video recording of the interview with Campas, where he makes the admissions set forth in the [block-quoted text above]." *Id.* (capitalization normalized).

Also in anticipation of the detention hearing, a probation officer submitted a pretrial services report.  Some of this report repeats verbatim the government's accusations from its motion to detain.  But the report also offers more detail about what Campas said in his online chats with the undercover FBI agent:

> Campas described [to the undercover agent] what he wanted to do to the [seven-year-old] boy, to include: "Hang naked, suck each other's cocks, rimming, making out, fucking, teach him how to fist me, teach him how to

4

> fuck and get fucked." Campas said he would "like to make
> it a lifelong love."

Aplt. App. vol. II at 1.[1]

The pretrial services report further noted that Campas is thirty-five years old and has lived in Arizona his whole life. He is unemployed, single, and does not have a valid passport. In terms of prior criminal history, he had been twice arrested, ten years earlier, for simple possession of a controlled substance, but there was no record of any conviction.

In the probation officer's opinion, "the information known at this time" and "the comments made by the defendant at the time of his arrest" show "there are no conditions which can be imposed to mitigate the risk the defendant poses at this time." *Id.* at 6.

---

[1] Campas submitted the pretrial services report under seal as volume II of his appendix, and he moved to keep volume II sealed. The Clerk of Court granted that motion, subject to this panel's further consideration. We do not disturb the Clerk's order because the pretrial services report contains personal identifying information and other sensitive information. However, "information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only *for the purposes of a bail determination* and shall *otherwise* be confidential." 18 U.S.C. § 3153(c)(1) (emphasis added). The bail determination remains in play, obviously, and some of Campas's arguments raise the question of where the district court obtained the information it relied upon. In our review, it is clear some of the challenged information ultimately traces back to the pretrial services report. Thus, although volume II of Campas's appendix will remain sealed, we nonetheless find it necessary to quote portions of it in this order and judgment. Most of what we quote can already be found elsewhere in the unsealed record, although usually without attribution to the pretrial services report. *See, e.g.*, Aplt. App. vol. I at 157 (district court decision listing the sexual acts Campas hoped to perform on the seven-year-old boy); Aplt. Opening Br. at 2–3 (summarizing information from the pretrial services report about Campas's circumstances and prior arrests).

###### B.     The Detention Hearing Before the Magistrate Judge

The magistrate judge held the detention hearing on November 29, 2023. There, the probation officer who prepared the pretrial services report informed the parties that he had since spoken with one of Campas's brothers, who lives in Tucson. This brother was willing to have Campas live at his home while awaiting trial.

As far as arguments for and against detention, the government rested heavily on Campas's alleged danger to the community. The government emphasized "that the defendant stated in a recorded statement he does not believe what he did was wrong here. . . .  [T]o not believe that there's something wrong with that I think raises a huge concern if he were to be released." Aplt. App. vol. I at 44.  The government also noted that online communications led to this situation, and it opined that it is difficult to limit a person's ability to communicate online.

Campas's attorney "[took] the government's representation . . . that . . . there may have been some discussion about [Campas's] beliefs," apparently referring to the recorded statement relied upon by the government. *Id.* at 46.  "But," he countered, "certainly whatever those beliefs may be ha[ve] not led to prior arrests or prior investigations." *Id.*  As to the government's concern about inability to restrict online communications, he conceded "we're past the point where it's feasible to function in the world without at least one [electronic device]," but the probation office could install monitoring software on a cell phone. *Id.* at 47–48.  Finally, the defense attorney admitted "we don't often . . . see . . . someone who makes a statement . . . that they have told the police that this type of conduct should be legal," but he had

6

spoken to his client and "he has no intention of defying the Court's orders, if [the court] were to release him, and engage in whatever his beliefs may be and engage in any type of conduct that is being alleged here." *Id.* at 48.

The magistrate judge first focused on "the allegation that [Campas] made some admissions to law enforcement about [his] belief system that are problematic. . . . [T]hose kinds of statements . . . move[] [the charges] into a different class in terms of risk." *Id.* at 50. On the other hand, the magistrate judge found it significant that there was no evidence Campas had ever acted on his beliefs before now. That, combined with family support, convinced the magistrate judge that Campas could be released on "very strict conditions." *Id.* at 51. Those conditions included, among other things, GPS monitoring, home detention in his brother's home (with exceptions for work and other necessary activities), full-time employment, no use of devices that can access the Internet other than for employment purposes (and those devices must have monitoring software), no viewing of sexually explicit materials (including those involving only adults), and no contact with anyone younger than eighteen without supervision of a court-approved adult.

## C.    The Appeal to the District Court

The government appealed the magistrate judge's ruling to the district court. The district court held a hearing, at which the government's attorney elaborated further on Campas's confession to law enforcement:

> Apparently there was some dispute in front of [the magistrate judge] about whether or not the United States' summary of the defendant's interview was accurate.

7

Specifically the United States has taken the [position] that during a post Miranda interview with law enforcement follow[ing] his arrest Mr. Campas expressed that he did not believe that he had done anything wrong in communicating with an undercover officer about the possibility of engaging in sexual activity with a seven-year-old. I want to reiterate, Your Honor, that it remains the United States' position that is in fact a correct and fair summary of that interview.

And I want to specifically mention[] a couple of comments that Mr. Campas made during his interview, the first of which involved him indicating or representing that he himself as a small child was sexually attracted to adult males. Without commenting further upon that claim, Your Honor, the defendant went on to explain to law enforcement that given his own sexual proclivities with respect to older men, he described the United States system of laws as it relates to consent as both discriminatory and arbitrary.

Mr. Campas explained on more than one occasion to law enforcement that he was very troubled by United States law as it relates to the age of consent and the fact that it is a criminal offense in the United States for adults to engage in sexual activity with children.

Mr. Campas expressed he wished he would be in the position to argue [as is] sometimes done apparently in Europe that he is a minor-attracted person, which is in his view not a choice. He then explained that he believed that all children should have the ability to control what they wanted to do in terms of their own sexuality and their own sexual activity even as it relates to sexual contact with adults.

Mr. Campas was expressly asked if he had shown up on the evening of his arrest and there had been an actual seven-year-old that appeared willing to engage in sexual activity with him, he indicated that he would not have any problem with doing that. He indicated that he believed that children should be able to indulge in sexual curiosity in whatever way they wanted even if they were as young as seven years old.

> Relatedly, Your Honor, Mr. Campas during his chats with the undercover officer indicated that he did not believe there was any age limit for adults and children to engaged in sexual activity. He described that he believed that children did have the ability in fact to engage in consensual activity, sexual activity with adults.
>
> . . . .
>
> Your Honor, in the government's view the circumstances of this offense are extraordinarily egregious. Mr. Campas traveled to the state of Utah fully expecting that he would in fact engage in sexual activity with a seven-year-old. And in the government's view there are no conditions or combination of conditions that would reasonably secure his appearance here in connection with this case and also the safety of the community.

Aplt. App. vol. I at 65–68. The government also re-emphasized its skepticism that release conditions would protect the community:

> As the Court is well aware, any restriction that would prohibit Mr. Campas from accessing the Internet or engaging in chats in the future is virtually unenforceable. Once he would be released from custody Mr. Campas' activity as it relates to these kinds of chats and these kinds of efforts would be virtually impossible to police for the probation office or for anyone, quite frankly.
>
> So in light of all of those factors, Your Honor, the United States continues to firmly believe that Mr. Campas should be detained pending that outcome of this matter.

*Id.* at 68.

Campas's attorney countered with further context about his client's confession to the government:

> What we ended up here having something very unusual. About an hour and a half long conversation between Agent Ross who is quite experienced in investigating these kind of offenses and somebody who is a little out of ordinary,

9

right? Numerous times throughout this interview, Mr. Campas had told Agent Ross that he wasn't going to act—you know, that he wasn't there for the child, right? The crime with which he's charged is the crime not so much of the completed act as an attempt to even engage in that act. It's all based on communication. But if we're going to talk about risks there's a couple things that are important to know, and I don't believe the government has evidence to the contrary.

First, he's denied being sexually attracted to children. He's admitted that when he was 14 years old he was sexually attracted to an adult male, and that's where some of his ideas and some of his thoughts and some of his musings on that particular area come from. He's also discussed with Agent Ross in quite an open conversation that in his mind the laws that have to do with statutory rape and sex crimes when it comes to age are arbitrary. And he gave an example of somebody being 17 years old as opposed to 18 years old. That was the example that Mr. Campas gave in that particular conversation.

He said he's never done it in the past. He said there would be nothing on his phone that would reveal anything different. He has had he says since 2012 discussions with others about sexual[] attraction to children. He's not denying that. And I believe the government in its last presentation said, yes, there were conversations that he has had with other individuals who were sexually attracted to children, or so they believed, but it was nothing of the sort where there would be some action or some agreement to meet somewhere.

In this particular instance as difficult as this is to hear, and I understand that, you know—what I hope comes across here is this is someone who is really struggling with his identity, with who he is, who had not acted on this in this same fashion for the 35 years of his life, and who is not here to—if it were the case that he is on a crusade because he believes the laws should be changed, then you would have reasons to believe that he's not going to comply with your orders.

*Id.* at 72–74. As for the government's concern that pretrial release conditions would not matter, Campas's attorney asserted that the government was setting up a no-win scenario:

> To say that he's virtually unsupervisable is equal to saying nobody is supervisable because I suppose anybody can violate conditions. But you can impose conditions, and some are mandatory with good reasons with these kind of cases. He can have GPS monitoring. He can have no Internet. He can be restricted to his brother's home in Tucson with the exception of probation visits, with exception of contact with his attorney, with the condition of church services and employment.
>
> But those are conditions that are routinely imposed. And based on the 35 years of his life, some of which was commendable and remarkable, I worry that we are just judging him on this allegation alone, which of course he hasn't yet been convicted. That's why he's been ordered released, because all that the government has at this point are the allegations in this case.

*Id.* at 74–75.

In rebuttal, the government asked the court to look again at Campas's online dialogue with the undercover FBI agent, such as the exchange where Campas denied having "age limits." In this light, the government claimed that

> to suggest that this man does not have a sexual attraction to children is simply false. Mr. Campas made those representations to an undercover officer in a setting in which he had no reason to believe that anyone else would ever see those chats. These are completely unguarded comments that he made in conjunction with his attempt to engage in sexual activity with a seven-year-old. Not only did he engage in chats about this activity, he actually made—he deliberately came to Utah for purposes of meeting with this seven-year-old. This wasn't just conversation that happened in a vacuum. He showed up

11

here to meet with this seven-year-old.  And he explained in excruciating detail what he wanted to occur between himself and this seven-year-old child.

He also acknowledged in his interview with the police that had that actual seven-year-old child been at that hotel or at that location he likely would have gone through with engaging in sexual activity with that child.  And when he was specifically asked, you wouldn't feel guilty about it if that kid appeared to be consenting in the conduct, Mr. Campas[] responded, that's probably accurate.

*Id.* at 76–77.

The district court ruled from the bench that Campas would remain detained pending trial:

Based on my [review], counsel, of this very important case, based on my review of the conversation with the undercover contact, based on my review of the specificity of that conversation, based on my review of experience with these types of cases in the past, and the great respect I have for [the magistrate judge],[2] the Court is of the view that there is no fact or set of facts that can guarantee public safety or appearance in this important matter.  And I'm accordingly going to find that Mr. Campas be held pending trial in this very important case.  I believe the evidence is very strong, and we'll just see how it unfolds as the case proceeds.

But the Court will affirm the government's objection to the magistrate judge's order and find that the judge's, magistrate judge's order is overruled pursuant to what the Court has just stated.

*Id.* at 77–78.

---

[2] In context, it appears the district court meant something to the effect of "and *despite* the great respect I have for [the magistrate judge]."

12

**D.      The First Appeal to this Court (No. 24-4003)**

Campas appealed the district court's decision to this court.  He argued, among other things, that the district court failed to explain its decision with reference to the factors it was required to consider under the Bail Reform Act.  This court agreed.  We held that the district court did not adequately explain its decision.  We therefore remanded for further explanation or, alternatively, for the district court to release Campas with conditions.

**E.      The District Court's Remand Decision**

The district court did not call for further briefing or argument.  Rather, a week after our decision, and before we had issued the mandate, the district court issued a written order reinstating its detention decision.

In terms of factual findings, the district court's order reproduces, mostly verbatim, a portion of the brief filed by the government when it appealed the magistrate judge's release decision to the district court.  That appeal brief went through each of the Bail Reform Act factors—the nature and circumstances of the offense, the weight of the evidence, Campas's history and characteristics, and the nature and seriousness of the danger he poses if released—and listed facts allegedly supporting detention under each factor.  The district court's remand order generally tracks this factor-by-factor analysis precisely.

By way of legal analysis, the order emphasizes that Campas's danger to the community, standing alone, was enough under the circumstances to justify detention:

While it is true that Mr. Campas has no criminal record and that this is the first time he has acted out, the court finds that this allegation is so serious and potentially harmful to children, that judging Mr. Campas on this allegation alone is not only appropriate, but necessary. Mr. Campas made the disturbing admission that he does not believe there is anything wrong with sexually molesting seven-year-old boys. Mr. Campas's belief that there is nothing wrong with sexually molesting young boys demonstrates a moral corruptness that is contrary to every principle of Western civilization throughout history. If Defendant is incapable of recognizing such an inherent depravity, it stands to reason that no external, court-ordered compulsory restrictions would overcome his internal justifications for this behavior.

Aplt. App. vol. I at 161. Finally, as to potential release conditions, the district court stated:

[1] The United States has emphasized the risk to the public that would exist if Mr. Campas were released on these charges. He engaged in similar behavior with three separate undercover officers, believing that he had the opportunity to engage in sexual conduct with extraordinarily young children. And whether the Court imposes restrictions or not, there is no practical way to enforce any restriction that would prohibit Mr. Campas from accessing the Internet. [2] Also, GPS monitoring does not tell us what a defendant is doing at any given time. It just tells us after-the-fact where the defendant has been. A person could arrange to meet another parent with sexual access to his child, arrive at the meet location and molest a young boy all before anyone would have any idea that he had violated a single term of pretrial release.

*Id.* at 161–62 (bracketed numerals inserted for clarity). Part [1] of this paragraph is a near-verbatim quote of the government's argument at the hearing preceding the district court's original detention order. *See id.* at 77. Part [2] is another

near-verbatim quote from the government's brief appealing the magistrate judge's decision to release Campas.  *See id.* at 23.

Campas filed a notice of appeal from this decision, leading to the current proceeding (No. 24-4024).  This court entered its mandate in the previous appeal (No. 24-4003) about two weeks later.

## III.    JURISDICTION

As the government points out, the district court's order on remand, which is the order on appeal here, was entered before this court's mandate in the previous appeal issued.  This raises a question of the district court's jurisdiction to issue the order pre-mandate.  Ideally, our remand in No. 24-4003, should have been a limited remand.  But given the procedural reality of what actually happened, we conclude that it is in the interest of judicial efficiency to overlook any potential problem created by the fact that this court's mandate followed, rather than preceded, the district court order on appeal.

The rule that jurisdiction lies with the appellate court from the notice of appeal until the mandate is "a judge-made doctrine, designed to promote judicial economy and avoid the confusion and inefficiency that might flow from putting the same issue before two courts at the same time."  *United States v. Madrid*, 633 F.3d 1222, 1226 (10th Cir. 2011) (internal quotation marks omitted).  In this case, there was no danger of confusion or inefficiency.  In fact, the same issue was *not* before this court and the district court at the same time.  Remanding to the district court with instructions to re-enter the same order now, post-mandate, would be the opposite of promoting

judicial economy and avoiding inefficiency. We therefore conclude, in this particular case and under these particular circumstances, the procedural irregularity is irrelevant, and we proceed to the merits.

## IV.    STANDARD OF REVIEW

This court "accept[s] the district court's findings of historical fact . . . unless they are clearly erroneous." *Cisneros*, 328 F.3d at 613. The court reviews de novo the district court's application of those facts to the law governing pretrial detention. *Id.*

## V.    ANALYSIS

Campas offers several arguments in favor of a second remand, but this time in front of a different judge. We address his arguments in turn.

### A.    Failure to Say Whether Campas Met His Rebuttal Burden

As previously noted, the crimes with which Campas has been charged carry a rebuttable presumption that he should be detained pending trial. No party disputes this.

The district court's order generically describes the rebuttable-presumption framework in § 3142(e), but the order does not say if Campas successfully produced "some evidence," *Stricklin*, 932 F.2d at 1355, as required to overcome the presumption. Campas says the district court erred by not announcing whether he had rebutted the presumption.

If this was error—a question we do not decide—it was harmless for at least two reasons. First, the district court never said anything to suggest Campas failed to

16

meet his burden, or that the court was holding any failure against him. Instead, it analyzed all the § 3142(g) factors, and it explained its conclusion with reference to the evidence, not the presumption. Second, regardless of the presumption, "the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government." *Stricklin*, 932 F.2d at 1354–55. There is no hint the district court disregarded this rule. Accordingly, the district court's lack of an explicit statement about whether Campas rebutted the presumption provides no reason to vacate or reverse.[3]

### B.    Failure to Say Whether the Government Carried its Burden

Campas next argues that the district court did not mention the government's preponderance burden (for risk of flight) and clear-and-convincing burden (for danger to the community). Therefore, according to Campas, "[t]his court is left to speculate about the process the district court followed and the analysis the district court conducted." Aplt. Opening Br. at 14–15.

Campas is correct that the district court did not say anything about the preponderance or clear-and-convincing burdens, but we do not agree with his conclusion. The district court analyzed the § 3142(g) factors, reached a conclusion, and explained its reasoning. This court is not required to speculate. *Cf. United States v. Kelley*, 359 F.3d 1302, 1305 (10th Cir. 2004) (stating, in the sentencing

---

[3] Campas also argues, without elaboration, that "the district court misstate[d] § 3142(e)." Aplt. Opening Br. at 13. We have not located any such misstatement in the district court's order.

context, "We do not require a ritualistic incantation to establish consideration of a legal issue, nor do we demand that the district court recite any magic words to show us that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider." (internal quotation marks omitted)).  Moreover, we review de novo whether the facts as found by the district court meet the legal standard for detention.  *Cisneros*, 328 F.3d at 613.  Thus, the fact that the district court's decision does not recite the burdens of persuasion or state that the government met them does not provide a basis to vacate or reverse.

C.    **Failure to Make Factual Findings**

As already noted, the district court's findings, and much of its analysis, came almost verbatim from the government's arguments when it appealed the magistrate judge's release order to the district court.  Campas criticizes this approach, but this alone is not enough to justify a second remand.  For instance, in the context of a civil bench trial, the Supreme Court has stated that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985).  We believe the same rule applies in this context.

Verbatim adoption of a party's findings and conclusions is a problem, however, "when those findings [take] the form of conclusory statements unsupported by citation to the record." *Id.*  Apparently with this in mind, Campas says that "[s]ince the allegations in the government's bail appeal are unsupported by the record, the

district court can not (and does not) make *any* reference to *any* document or transcript in this case." Aplt. Opening Br. at 15 (footnote omitted).

Campas is correct that the district court's order does not cite any document or transcript. This makes our review more difficult. However, all of the district court's findings have support in the government's motion for detention, the pretrial services report, or the transcript of the hearing before the district judge (on appeal from the magistrate judge's release order). The district court's most important findings are as follows, to which we have added bracketed citations showing the record support:

> (a) An FBI agent, acting in an undercover capacity on a social media platform, purported to be a father who was offering his seven-year-old son for sex. Beginning on October 11, 2023, Mr. Campas contacted the undercover agent on a social media platform. Over the course of the next two weeks, the two engaged in sexually explicit conversations. [Aplt. App. vol. I at 14 (government's motion for detention); Aplt. App. vol. II at 1 (pretrial services report).]

> (b) The FBI undercover agent asked Mr. Campas if he had "age limits," to which he responded, "Fuck no, nothing hotter than a father nursing his newborn on his cock." Defendant was very specific about what he wanted to do to the seven-year-old boy, to include: "Hang naked . . . suck each other's cocks . . . rimming . . . making out . . . fucking . . . teach him how to fist me . . . Teach him how to fuck and get fucked." Defendant said he would like to "make it a lifelong love." [Aplt. App. vol. I at 14 (government's motion for detention); Aplt. App. vol. II at 1 (pretrial services report).]

> (c) Mr. Campas had planned to drive from Oregon, where he had been living for the prior month on a marijuana farm, to his mother's home in Arizona, by way of Las Vegas. However, after these conversations with the undercover agent, he decided to go out of his way and

travel to Utah so that he could sexually abuse the seven-year-old.  [Aplt. App. vol. I at 14–15 (government's motion for detention); Aplt. App. vol. II at 1–2 (pretrial services report).]

(d) Mr. Campas arranged to meet the undercover agent and his seven-year-old boy on October 27, 2023, at a location in North Salt Lake, Utah.  Mr. Campas arrived at that location as planned, where he was arrested.  He had in his possession the cell phone he had been using to communicate with the undercover agent.  [Aplt. App. vol. I at 14 (government's motion for detention).]

(e) Mr. Campas was interviewed following his arrest.  During that interview, Mr. Campas stated that he did not believe that what he was doing was wrong.  He stated that he knew from the time he was a very young boy that he wanted to have sex with adult males and, therefore, children are clearly capable of consenting to sex.  [Aplt. App. vol. I at 14 (government's motion for detention); *id.* at 66 (transcript of hearing before the district judge); Aplt. App. vol. II at 1 (pretrial services report).]

(f) Mr. Campas was expressly asked if he had shown up on the evening of his arrest and there had been an actual seven-year-old that appeared willing to engage in sexual activity with him, would he have engaged in sexual activity with the child, and he indicated that he would not have any problem with doing that.  He indicated that he believed that children should be able to indulge in sexual curiosity in whatever way they wanted even if they were as young as seven years old.  [Aplt. App. vol. I at 67 (transcript of hearing before the district judge).]

(a) [sic] At the time Mr. Campas was communicating with the undercover agent in this case, he was also communicating with at least two other undercover agents unrelated to this case on various social media platforms about his sexual interest in young children.  [Aplt. App. vol. I at 14 (government's motion for detention); Aplt. App. vol. II at 2 (pretrial services report).]

20

Aplt. App. vol. I at 157–58.[4]

Campas also appears to argue that the district court could not rely on the government's representations cited above because "[t]he only thing resembling a proffer in [the] government's appeal [from the magistrate judge's release order]" is a statement that "[o]fficers will testify that Mr. Campas arrived at the meet location exactly as planned." Aplt. Opening Br. at 15 n.4 (internal quotation marks omitted). Similarly, Campas asserts "[t]he post-arrest interview was not part of the record," so "[t]he government's interpretation of an alleged conversation about [his] supposed beliefs [about adult-child sexual relations] is irrelevant." *Id.* at 5 n.3; *see also id.* at 6 ("The government also pointed to Mr. Campas having made recorded statements concerning his involvement in the instant matter, but made no proffer as to those statements." (brackets and internal quotation marks omitted)).

Campas's argument ignores that some of the district court's information is found in the pretrial services report, not just the government's submissions. The argument is also waived. When the government described its evidence to the district court, Campas's attorney never objected that the government needed to introduce

---

[4] These comprise the district court's findings about the nature and circumstances of the offense. The district court repeated many of the same findings in summary form when it discussed the other § 3142(g) factors, *i.e.*, the weight of the evidence, Campas's history and characteristics, and the nature and seriousness of the danger he may pose. *See* Aplt. App. vol. I at 158–60. Under the circumstances, we see no error. For example, Campas's statements in his recorded interview naturally matter to all of these factors. Thus, we find no basis to fault the district court for at times repeating the same material under the various factors.

something more than its own description.  To be sure, as described above (Part II.C),

Campas's attorney tried to persuade the district court that the government was

overstating what Campas had admitted in his post-arrest interview.  But he never

argued that the government failed to make a valid proffer, and "[a]rguments that were

not raised below are waived for purposes of appeal," *Schrock v. Wyeth, Inc.*, 727 F.3d

1273, 1284 (10th Cir. 2013) (internal quotation marks omitted).

Even if not waived, we disagree with the argument on the merits.  "Every

circuit to have considered the matter . . . has . . . permitted the Government to

proceed by way of proffer."  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir.

1996).  Campas appears to believe a valid government proffer must begin with

special words such as "we would proffer" or "officers will testify that."  He offers no

authority for this position.  We therefore reject the claim that the government's

description of its evidence was not something on which the district court could rely—

or is not something on which this court may rely—for purposes of reaching a

decision about pretrial detention.

### D.    Reliance on the Charges Alone

Campas asserts it would be contrary to congressional intent if his alleged

crimes, by themselves, were enough to justify detention, because Congress did not

specify that any offense automatically requires detention.  Campas further asserts the

district court violated congressional intent because the remand order "states in no

uncertain terms that the allegation itself is the sole ground upon which detention is

ordered," and the district court further "assumed that anyone charged with such crimes presents a[n] unmitigated danger to society." Aplt. Opening Br. at 17, 18.

If this were true, it would not necessarily lead to vacatur or reversal because we review de novo the application of the historical facts to the detention standard. In any event, Campas does not accurately describe the district court's reasoning. The district court did not conclude that the charged offenses, by themselves, are enough to justify detention. Rather, the court relied on Campas's willingness to go hundreds of miles out of his way to commit the alleged crimes, his belief that he would have done nothing wrong if he had gone through with his very explicit intentions, and his simultaneous interactions with other undercover agents about the same topic. Looking at this matter de novo, we come to the same conclusion as the district court, namely, this combination of facts shows that Campas presents a unique danger.

### E.    Failure to Review the Magistrate Judge's Release Conditions

When a party appeals a magistrate judge's detention decision to the district court, the district court "acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release." *Cisneros*, 328 F.3d at 616 n.1. Relying on *Cisneros*, Campas says "[t]he district court failed to make the requisite independent determination of the magistrate [judge]'s findings that a combination of conditions exist that would reasonably assure [his appearance and community safety]." Aplt. Opening Br. at 20 (internal quotation marks omitted).

This argument appears to assume the magistrate judge's findings bear some sort of presumptive weight before the district court. They do not. Again, the district court reviews the matter de novo.

In any event, the district court considered potential release conditions. Campas recognizes this because he goes on to criticize the district court's finding that GPS monitoring probably could only help to discover a violation after the fact. Campas says the district court impermissibly relied on a "theoretical possibility that [he] could do while under court supervision what he has never done before [*i.e.*, commit a hands-on offense]." *Id.* at 21.

District courts making detention decisions are routinely engaging in "theoretical" possibilities because they cannot know the future with certainty. This alone cannot undermine the district court's decision. In addition, the district court considered Campas's heretofore clean record. *See* Aplt. App. vol. I at 161 (finding detention appropriate even though "it is true that Mr. Campas has no criminal record and that this is the first time he has acted out"). If Campas means to say there is a presumption in favor of release for first-time offenders, he offers no supporting authority.

Campas also appears to be suggesting that the district court's reasoning, if affirmed, could allow district courts to discount GPS monitoring as a possible condition of pretrial release in essentially all cases. We need not engage with that argument because we evaluate the matter de novo, under the specific facts of this case.

Given Campas's unique threat, the two most important considerations when thinking about pretrial release are his ability to communicate and his ability to travel. Concerning communication, the district court found—and Campas does not dispute—that restrictions on Internet access would be ineffectual. We agree that the ubiquity of devices with Internet access, combined with Campas's unique beliefs and motivations concerning adult-child sexual relations, demonstrate that restrictions on Internet access would not be enough to adequately guarantee Campas's inability to engage in the kinds of communications that led to this prosecution. As for travel, we conclude that the acknowledged weaknesses in GPS monitoring combined with the unique threat posed by Campas (as demonstrated by his words and actions) show that GPS monitoring would not be adequate in his case to protect the public.

## VI.    CONCLUSION

The government has carried its burden to show by clear and convincing evidence that no conditions will protect the community from Campas's behavior while he awaits trial. We therefore affirm the district court's detention order. We deny as moot Campas's request that the case be remanded to a different judge.

Entered for the Court
Per Curiam

No. 24-4024, *United States v. Campas*
**EID**, J., dissenting.

A case cannot be in two places at once.  Yet here, that is exactly what happened.  Before this Court had issued its mandate in the earlier appeal, the district court issued the order underlying today's *per curiam* decision determining the merits of the appellant's claims.  Federal courts have "generally understood" that an appeal "divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  Nonetheless, the *per curiam* charts this course, reaching the merits of the case by deciding "in the interest of judicial efficiency to overlook" the jurisdictional error.  *Per Curiam* at 15.  Respectfully, I would not "overlook" the error for two reasons.

First, jurisdiction is jurisdiction, and this Court is bound by jurisdictional rules.  True, this case does not involve the more stringent jurisdictional requirements imposed by Article III of the U.S. Constitution or a statute; rather, we are dealing with a "judge-made doctrine."  *Id.* (quoting *United States v. Madrid*, 633 F.3d 1222, 1226 (10th Cir. 2011)).  But the jurisdictional rule in this case is "a longstanding tenet of American procedure."  *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023).  The *per curiam* unnecessarily "expand[s] the universe of court-created exceptions to the general rule depriving the district court of authority to rule on matters once the case is in the court of appeals."  *Madrid*, 633 F.3d at 1226–27 (citation omitted).  Indeed, the new exception now allows this Court to overlook a jurisdictional problem between a district court and

itself so long as this Court finds it convenient to do so in the interest of "judicial efficiency." *Per Curiam* at 15.

Second, we had a simple solution here, one that we had complete control over. This Court could have easily fixed the jurisdictional problem by entering an order requiring the district court to fix the procedural defect via a re-entry of its findings and conclusions. Such a solution would have posed no threat to judicial economy. The district court could have fixed the jurisdictional error, and we could have then proceeded to the merits without dismantling "a longstanding tenet of American procedure." *Coinbase, Inc.*, 599 U.S. at 740. For these reasons, I respectfully dissent.